STATE OF MAINE
PENOBSCOT, SS.

SUPERIOR COURT
CIVIL ACTION
Docket No. RE-01-42

First Union National Bank,
      Plaintiff/Counterclaim
      Defendant

v.

Richard R. Curtis and Melissa Curtis,
      Defendants/Cross-Claim Defendant/
      Third-Party Counterclaim Defendant

and

Eleanor May Reilly,
      Party-in-Interest/Counterclaim
      Plaintiff/Third-Party Plaintiff

v.

Crossland Mortgage Corp.,
      Third-Party Defendant/
      Third-Party Counterclaim Plaintiff[1]

FILED & ENTERED
SUPERIOR COURT
SEP 08 2004
PENOBSCOT COUNTY

Decision and Judgment

---

[1] Although the issue was partially addressed in the court's April 29, 2004, order on First Union's motion for judgment on the pleadings, none of the parties has formally moved to recast their roles properly. The court takes the liberty of doing so here. Thus, First Union is now the plaintiff and the defendant on Reilly's counterclaim. Both Curtis defendants, in addition to being defendants on First Union's foreclosure complaint, are defendants in both Reilly's cross-claim and Crossland's third-party counterclaim. Then, in addition to being named by First Union as a party-in-interest in the foreclosure action, Reilly has filed the cross-claims against the Curtis defendants, a counterclaim against First Union and a third-party complaint against Crossland. Finally, Crossland is the defendant in Reilly's third-party claim, and it is a third-party counterclaim plaintiff for indemnification against the Curtis defendants.

1

Hearing on all pending claims was held on July 14, 2004. Present were: counsel for First Union National Bank; Eleanor May Reilly and her counsel; and counsel for Crossland Mortgage Co. Prior to trial, the clerk entered defaults against Richard Curtis and Melissa Curtis on Reilly's cross-claims against them, and the court entered a judgment of foreclosure against them. The Curtis defendants did not appear at trial. The principal issues in this case are, first, whether Reilly is entitled to avoid a release of her life estate in a house located on Fruit Street in Bangor (which conveyance had the result of subordinating her interest to a mortgage, now held by First Union, on which the mortgagors (the Curtis defendants) have defaulted), and, second, whether Reilly has established tort-based claims against the original mortgagee, Crossland.

## A. Findings of fact

Eleanor Reilly and her husband, Paul R. Reilly, who died in the late 1980's, moved into the Fruit Street residence in 1977. Although Reilly believed for many years that she had an ownership interest in the property, in fact it was owned jointly by her husband and their son, Paul A. Reilly. *See* exhibit 8. After Paul R. Reilly's death, Paul A. Reilly became the sole owner, although Eleanor continued to live there. Paul A. Reilly died in 1997. *See* exhibit 31. The personal representative of Paul A. Reilly's estate conveyed the Fruit Street property to defendant Melissa Curtis by deed dated October 5, 1999. *See* exhibit 1. Melissa is Eleanor Reilly's granddaughter. Through the same instrument, Eleanor was preserved a life estate in the Fruit Street property. *See id.*

Melissa Curtis and her husband, co-defendant Richard Curtis, applied for a loan with Crossland. *See* exhibit 36.[2] The loan was to be secured by a mortgage on the Fruit Street property. (In the application, Richard and Melissa describe themselves as owners in joint tenancy of the Fruit Street property. The record does not appear to disclose when Richard acquired an ownership interest in the property, although the parties do not contest any such interest.) Crossland evidently advised the Curtises that it would not approve the secured loan because Eleanor Reilly had a life estate in the premises and her interest would be superior to any interest that Crossland would acquire from the Curtises. Melissa then approached Reilly and explained that she and her husband, Richard, wanted

---

[2] The loan application is dated October 12. However, the sequence of events suggests that the Curtises took steps to obtain that loan prior to that date.

2

to obtain the loan proceeds but that this could be accomplished only if she (Reilly) released her life estate, making the collateral available to the lender. Melissa assured Reilly that the life estate would be restored in the short term. In Eleanor's view, she and Melissa had a close relationship. Melissa had lived with Eleanor for a time apparently because of difficulties between Melissa and her mother (Eleanor's daughter); Melissa ran errands for Eleanor, who was 78 years old at the time (Melissa's mother declined to help out Eleanor); and Eleanor fully trusted Melissa.[3] Because of this relationship, Eleanor acceded to Melissa's request and agreed to surrender her life estate in order to help out her granddaughter. Eleanor did not have independent counsel to advise her in the transaction.

On October 5, 1999, Sandra Hite, an employee of Attorney David Bower, met with Eleanor at the Fruit Street house. Melissa and several others were present. The court finds that Hite's account of the transaction is credible. Hite had been informed that Eleanor Reilly planned and was willing to release her life estate so that the Curtises (who appear to have used Bower's legal services in connection with previous real estate transactions) would be eligible for the loan through the Crossland mortgage. Hite and Reilly had some conversation about the nature of the transaction. The court is satisfied that Hite proceeded in good faith and did not have reason to believe that Reilly was hesitant in releasing her life estate interest or failed to understand the nature of the transaction. Under those circumstances, Reilly executed a release of her life estate. *See* exhibit 2. The deed to Melissa (which also included the apparent creation and reservation of Reilly's life estate), *see* exhibit 1, and Reilly 's release of her life estate were recorded in the Penobscot County Registry of Deeds in immediate sequential order.

One week after the October 5 events, the Curtises executed a mortgage deed in favor of Crossland. On either that day or the day after (the date on the document is not clear), the Curtises executed a release to Reilly, creating a new life estate in Reilly's favor. *See* exhibit 5. Because of the sequence of recording, Reilly's life estate was now inferior to the Crossland's interest created in the mortgage deed. As of October 5, 1999,

---

[3] In addition to trusting Melissa in connection with the real estate transaction, Eleanor also trusted Melissa in other financial matters. Eleanor paid the price for this, when Melissa used Eleanor's credit card for more than $5,000 in unauthorized purchases.

3

a mortgage encumbered the Fruit Street property. The balance on that mortgage was less than $500. That debt was extinguished by the loan proceeds generated by the Curtis' mortgage issued to Crossland. Eleanor Reilly received no direct value for her relinquishment of the first life estate she held. She continued to live at the Fruit Street house.

In mid-2000, the Curtises defaulted on the loan secured by the mortgage on the Fruit Street property. They paid the amount due in May, but the payment due to June 2000 was either not paid or was rejected for reasons that are not challenged here. In late July, Option One, which was servicing the loan for BNC Mortgage, Inc.,[4] sent a notice of default to the Curtises. Because the Curtises failed to cure that default, in August 2000, Option One referred the matter to an attorney in Maine so that a foreclosure proceeding could be initiated. At some point, however, the Curtises initiated a bankruptcy proceeding, and that action stalled a foreclosure action.

On August 20, 2001, BNC formalized an assignment of the Curtis mortgage to First Union. Option One also services at least some of First Union's mortgages, including the Curtis' mortgage loan account on the Fruit Street property. Thus, when it acquired the mortgage, First Union knew either actually or constructively that the mortgage was in default and that the account was "nonperforming." It is most likely that First Union acquired the mortgage from BNC as one of a larger pool of accounts. There is no evidence of the value of the account when First Union purchased it, the amount of any consideration paid by First Union for it, or the nature of any influence it may have had in the consideration paid by First Union for a collection of mortgages. However, First Union had access to an analysis of this and all other loans it purchased.

On the day after the formal assignment of the mortgage was executed, First Union commenced this foreclosure action against the Curtis defendants, naming Reilly as a party-in-interest. Because the Curtises have not defended or otherwise appeared in this action, a default judgment has been entered against them on First Union's complaint for foreclosure. That order, however, expressly reserved to Reilly her right to pursue her

---

[4] Crossland assigned the Curtis mortgage to BNC in February 2000. BNC participates in the secondary market for mortgages, buying and selling those accounts from and to others.

4

claim in this action that her relinquishment of the original life estate she held in the property is void under the Improvident Transfers of Title Act, 33 M.R.S.A. § 1021 *et seq.*, (ITTA). If it is not void, then her rights are subordinate to First Union's rights to relief on the foreclosure claim, including a sale of the property. Further, the clerk has entered defaults against the Curtis defendants on Reilly's tort-based cross-claims against them.

## B. Discussion

### (1) Improvident Transfers of Title Act

Title 33 M.R.S.A. § 1022(1) creates a presumption that an elderly person was the object of undue influence in a transfer of real estate if (a) the elderly person/transferor receives less than full consideration for the interest that is conveyed to another; (b) the elderly person is dependent on others within the meaning of section 1021(1); (c) the transferor and transferee are in a confidential or fiduciary relationship with each other within the meaning of section 1022(2); and (d) the transferor was not represented in the transfer by independent counsel. When these circumstances are present, and when the transferee fails to rebut the presumption of undue influence, then the transferor is entitled to avoid the transfer. This right of avoidance, however, is subject to the exclusion set out in section 1023(2), which provides that the transferor's remedies do not "affect or limit the right, title and interest of good faith purchasers [and] mortgagees. . .who obtain an interest in the transferred property for value after its transfer from the elderly dependent person. No relief obtained or granted [to the transferor]. . .may affect any mortgage deed to the extent of value given by the mortgagee."

Reilly has established the elements necessary to raise the statutory presumption of undue influence. She is an elderly person, because at the time of the transfer in 1999, she was older than age 60. Although the evidence is less than overwhelming on this point, the court is also able to conclude that at that time, Reilly was "dependent" within the meaning of section 1021(1). She then was a 78 year old widow, who appears to have relied on Melissa both for emotional support and also for material, day-to-day assistance, as manifested by the very fact that Melissa ran errands for Reilly. This conclusion is strengthened by Reilly's pointed testimony that she could not rely on her daughter (apparently, Melissa's mother) as a source of "help." The court also observed Reilly in

5

the courtroom and noted that she needs considerable assistance to move around and that she had difficulty hearing. Although this represented her condition in 2004, it provides some insight into her circumstances in October 1999.

Further, the best available evidence is that Reilly received less than full consideration for the transfer that subordinated her life estate to the rights of the mortgagee. Although the court agrees with Crossland that Reilly's claim for relief under the ITTA does not implicate Crossland as a source of relief, Crossland argues that Reilly transferred her life estate back to Melissa as part of a settlement of claims associated with the probate of Paul A. Reilly's estate. Crossland argues that the fact of the settlement is adequate consideration. The factual basis for this argument is the temporal proximity of the deed from the estate's personal representative to Melissa, and Eleanor's nearly contemporaneous transfer of the life estate back to Melissa. Crossland's factual analysis is not unreasonable. However, it is speculative and fails to answer the question of why, if the transfers among the P.R., Melissa and Reilly were an integrated package, the deed to Melissa was used to create the life estate in the first place. There was no need for the deed to Melissa to reserve a life estate to Reilly, if the plan was to allow a mortgage to encumber the Fruit Street property prior to the time Reilly acquired a life estate in the premises. Thus, the evidence more credibly suggests that Reilly's conveyance of her life estate was a separate transaction, motivated solely by Reilly's willingness to help Melissa obtain the loan proceeds from Crossland.

Next, this transfer was made in the context of a confidential or fiduciary relationship because Reilly's relationship with Melissa was close and because they are members of the same family. *See* 33 M.R.S.A. § 1022(2). And finally, Reilly was not represented by independent counsel during this transaction.

These factors combine to raise a presumption that the transfer was affected by undue influence. Remaining aspects of the trial record are insufficient to rebut that presumption. As is noted above, the court concludes that Reilly became willing to surrender her life estate only because Melissa wanted her to do so and because she (Reilly) was willing to help Melissa. It is apparent that Melissa did not have Reilly's best interests at heart, as is shown not only by her conduct affecting the property but also her wrongful use of Reilly' credit card, for which Reilly was left liable. It is also apparent

6

that from any objective perspective, it was patently unwise for Reilly to expose herself to the loss of her house. She had lived there since the late 1970's; it was a place of strong emotional attachment; and she did not have the independent financial means to obtain alternative housing. Thus, the court ascribes Melissa's powers of persuasion to Reilly's decision to compromise her interests as she did.

First Union then raises two issues based on statute that it claims bars Reilly's claim of avoidance. It argues that, first, under section 1023(1), it is a "good faith purchaser[]," and second, that it obtained its interest "for value. . . ." As First Union has framed its argument here, it has not established this exclusion to Reilly's right to relief.[5] In its post-trial written argument, First Union expressly adopted the memorandum of law it filed in support of its motion for summary judgment. In its initial memorandum of law in support of that motion, First Union argued directly that it is a holder in due course and, having that capacity, is entitled to the protection created in section 1023. In other words, First Union equates the notion of a good faith purchaser under section 1023 with the concept of a holder in due course.[6] A party can achieve the status of a holder in due course, however, only if it takes an instrument "[w]ithout notice that the instrument is overdue

. . .or that there is an uncured default with respect to payment of another instrument issued as part of the same series. . . ." 11 M.R.S.A. § 3-1302(1)(b)(iii). This is not true here, because when First Union acquired the mortgage, the account had been in default for more than one year. Option One is a common agent to BNC and First Union, and thus knowledge of the "nonperforming" status of the account while held by BNC can be attributed to First Union. Also, when a party purchases mortgages on the secondary

---

[5] Because the "good faith purchaser" and "for value" issues are exclusions or limitations to liability, the court imposes on First Union the burden to prove these matters.

[6] In its reply to Reilly's opposition to its motion for summary judgment, First Union may be seen to distance itself from the argument based on the status of a holder in due course. However, in presenting its position following the trial on the merits, First Union adopted and therefore ratified the holder in due course analysis. Further, First Union did not file a reply brief responding to Reilly's affirmative discussion of the law of a holder in due course. This is a further indication that First Union retains its position that it should be treated as a holder in due course. The court can only conclude that any intervening attempt to disclaim that argument has been abandoned.

market, it either does or can obtain an analysis of the account, which here would reveal the default and perhaps even BNC's intention to foreclose.

Second, there is no evidence that First Union acquired the Curtis mortgage for value. The record sheds no light on the value of this account, and whether First Union paid that (or, for that matter, any) value. If the Curtis mortgage was only one of several mortgages sold by BNC to First Union as part of a package, then that evidence of value would be one part of a whole. As First Union's representative testified, such a package includes "good" and "bad" accounts. Thus, even though each individual account should influence the overall terms of the purchase and sale, there is no evidence here that would support a finding that First Union in fact paid "value" for the Curtis account specifically.

Therefore, the court concludes that Reilly's decision to release her life estate on October 5, 199, was the product of undue influence brought to bear on her by Melissa Curtis. Further, this case does not present the circumstances where a remote purchaser of the interest is protected from the transferor's right to avoid the original conveyance. Consequently, the court avoids and vitiates the conveyance described in the October 5, 1999, deed from Eleanor Reilly to Melissa Curtis.

### (2) Reilly's tort claims against Crossland

Reilly has asserted claims against Crossland for fraud (count 2 of her responsive pleading); misrepresentation in the inducement (count 4); negligent misrepresentation (count 5); intentional infliction of emotional distress (count 8); negligent infliction of emotional distress (count 10); and violation of the Unfair Trade Practices Act, 5 M.R.S.A. § 205-A. Reilly's claims against Crossland are premised on the proposition that Hite was Crossland's agent.[7] Reilly has failed to prove any of these claims because, simply put, she has not established that Crossland, through Hite, did anything wrong. The best evidence demonstrates that Melissa Curtis had already secured Reilly's agreement and did so by unduly influencing Reilly to release her life estate. When Hite had contact with Reilly, there was nothing to suggest that Reilly's participation was factually or legally compromised. Hite herself did not pressure or induce Reilly to participate in the transaction. And despite Reilly's account of the meeting with Hite, the

---

[7] If that were not the case, then Reilly could not even argue that the wrongful conduct she assigns to Hite must be imputed to Crossland.

court is persuaded that Hite did not misrepresent the limitations of any loss that Reilly was creating for herself by relinquishing her life estate. Thus, Reilly has not proven that Hite engaged in any wrongful acts of an affirmative nature.

The evidence also does not support a contention that Hite had a duty to disclose any matters to Reilly. Hite and Reilly did not stand in a confidential relationship that otherwise might trigger a duty to disclose, and Reilly makes no argument of any other basis for such a duty.

The court need not and does not reach Crossland's other challenges to Reilly's claims against it.

### (3) Damages against Melissa Curtis and Richard Curtis

The Curtis defendants have defaulted on the claims that Reilly has pleaded against them. Thus, they are deemed to be liable on each of those claims, and they have forfeited the right to lodge the type of arguments that Crossland has offered in support of its contentions that, as a matter of law, Reilly cannot prevail on her causes of action for damages.

Reilly does not advance any argument on damages that is specific to the Curtis defendants.[8] The court has concluded that the Reilly's transfer of her life estate, induced by Melissa, shall be avoided. Thus, the loss of her house is not a basis for an award of damages. However, Reilly has lived in a profoundly anxious state for the last several years because of the conduct of the Curtis defendants. For a person as vulnerable as she is, the prospects of losing her family home has been emotionally crippling at times. The court therefore awards her $50,000 in compensatory damages. Even though Reilly included punitive damages in her prayers for relief set out in her responsive pleading, she has not made a substantive argument for that recovery here, and for that reason, the court declines to address or award punitive damages.


The entry shall be:

For the foregoing reasons, on count 6 of Eleanor May Reilly's counterclaim, judgment is entered for Eleanor Reilly. The court declares that the Release Deed from

---

[8] Her position on money damages is limited to her claims against Crossland, and it is curiously based largely on the amount that she projects Crossland has gained in the transaction with the Curtises.

9

Eleanor May Reilly to Melissa A. Curtis dated October 5, 1999, and recorded at book 7200 page 77 of the Penobscot County Registry of Deeds is null, void and of no effect. The Judgment of Foreclosure in this matter dated March 9, 2004, is amended to provide that the interest of Eleanor May Reilly, as more fully described in a deed of distribution from Merry A. Paul, Personal Representative of the Estate of Paul A. Reilly, to Melissa A. Curtis, which deed is dated October 5, 1999, and recorded at book 7200 page 76 of the Penobscot County Registry of Deeds, shall be superior to any rights and remedies created by that Judgment of Foreclosure.

On counts 2, 4, 5, 8, 10 and 11 of Eleanor May Reilly's third-party complaint against Crossland Mortgage Corp., judgment is entered for Crossland Mortgage Corp.

On counts 1, 3, 7 and 9 of Eleanor May Reilly's cross-claim against Melissa Curtis and Richard R. Curtis, III, judgment is entered for Eleanor May Reilly against Melissa Curtis and Richard R. Curtis, III, jointly and severally, in the amount of $50,000, plus pre-judgment interest at the annual rate of 7.052% and post-judgment interest at the annual rate of 7.41%.

Count 12 of Eleanor May Reilly's responsive pleading is dismissed as moot.

Eleanor May Reilly is awarded her costs of court as against First Union National Bank, Melissa Curtis and Richard R. Curtis, III. Crossland Mortgage Corp. is awarded its costs as against Eleanor May Reilly.

Dated: September 7, 2004

_____
Justice, Maine Superior Court
Jeffrey L. Hjelm

10

SUPERIOR COURT
PENOBSCOT, ss.
Docket No   BANSC-RE-2001-00042

**DOCKET RECORD**

FIRST UNION NATIONAL BANK - PLAINTIFF

Attorney for: FIRST UNION NATIONAL BANK
DAVID DUNLAVEY
PHILLIPS OLORE & DUNLAVEY
480 MAIN ST
PO BOX 1087
PRESQUE ISLE ME 04769-1087

Attorney for: FIRST UNION NATIONAL BANK
PHILIP R FOSTER
FOSTER LAW OFFICES
24 CHURCH ST
PO BOX 919
ELLSWORTH ME 04605-0919

vs
RICHARD R CURTIS III - DEFENDANT
MELISSA CURTIS  - DEFENDANT
CROSSLAND MORTGAGE CORP - DEFENDANT
3902 S STATE ST
SALT LAKE CITY UT
Attorney for: CROSSLAND MORTGAGE CORP
PETER CULLEY
PIERCE ATWOOD
ONE MONUMENT SQUARE

PORTLAND ME 04101

ELEANOR MAY REILLY  - PARTIES IN INTEREST

Attorney for: ELEANOR MAY REILLY
EDMOND BEAROR
RUDMAN & WINCHELL
84 HARLOW ST
PO BOX 1401
BANGOR ME 04402-1401

Attorney for: ELEANOR MAY REILLY
LUKE M ROSSIGNOL
HARDINGS LAW OFFICES
427 MAIN STREET
PO BOX 427
PRESQUE ISLE ME 04769-0427

Filing Document: NOTICE OF REMOVAL          Minor Case Type: FORECLOSURE
Filing Date: 11/06/2001

## Docket Events:
05/15/2002 FILING DOCUMENT - NOTICE OF REMOVAL FILED ON 11/06/2001
        TITLE TO REAL ESTATE IS INVOLVED.

        NOTE - PRIOR ENTRIES IN MANUAL DOCKET ENTERED ON 11/06/2001